## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

KRISTAL A. GURGONE,

                Plaintiff,

    v.

KILOLO KIJAKAZI,[1]
Acting Commissioner of Social Security,

              Defendant.

No. 4:18-cv-40133-TSH

## REPORT AND RECOMMENDATION

September 1, 2022

Hennessy, M.J.

Plaintiff Kristal A. Gurgone ("Gurgone") moves for an order reversing or vacating Defendant Acting Commissioner of Social Security's decision ("Commissioner" or "Defendant") denying her application for Disability Insurance Benefits ("DIB").  [Dkt. Nos. 1, 19].  The Commissioner opposes Gurgone's entitlement to DIB, and seeks an order affirming her decision denying benefits.  [Dkt. Nos. 16, 24].  Judge Hillman referred the matter to me for a Report and Recommendation.  [Dkt. No. 27].

For the reasons stated below, I hereby RECOMMEND that Gurgone's Motion to Reverse or Remand the Decision of the Commissioner [Dkt. No. 19] be DENIED and Defendant's Motion to Affirm the Commissioner's Decision [Dkt. No. 24] be GRANTED.

---

[1] Acting Commissioner Kilolo Kijakazi is automatically substituted as a party.  See Fed. R. Civ. P. 25(d).

## I.   BACKGROUND

### A.   Procedural History

On April 19, 2016, Gurgone filed her application for DIB, alleging she was disabled beginning March 18, 2015.  [Tr. 10].[2]  The application was denied initially on August 29, 2016 and on reconsideration on November 23, 2016.  [Id.].  An Administrative Law Judge ("ALJ") held a video hearing on October 31, 2017 [Tr. 37–65], and denied Gurgone's application on November 28, 2017.  [Tr. 7–31].  The ALJ found that Gurgone was not disabled under the Social Security Act between March 18, 2015, the date Gurgone claimed her disability began, and March 31, 2017, the date Gurgone was last insured (hereinafter, "claimed disability period").[3]  [Tr. 10, 12].

Gurgone filed a request for review of the ALJ's decision on January 8, 2018 [Tr. 180–81], which the Appeals Council denied on June 5, 2018, rendering the ALJ's decision final and ripe for judicial review.  [Tr. 1].  Gurgone filed a complaint with this Court on August 3, 2018, and the Commissioner answered on March 16, 2020.  [Dkt. Nos. 1, 16].  Gurgone filed a motion asking the Court to reverse or remand the decision of the Commissioner on July 20, 2020, and the Commissioner filed a cross-motion asking the Court to affirm the decision on September 28, 2020. [Dkt. Nos. 19, 24].

### B.   Personal History

Gurgone was 35 years old when she first claimed disability.  [Tr. 66].  She completed "4 or more years of college" and was last employed in June 2014 as a teacher.  [Tr. 201–02].  In her Disability Report, Gurgone claimed that the conditions limiting her ability to work included "chronic left ankle pain" and "cardiac condition," though she did not stop working because of

---

[2] Citations to the administrative record are to Transcript page numbers ("Tr."), rather than the page numbers assigned by the Electronic Case Files system.  [See Dkt. No. 17].

[3] Because Gurgone applied for Disability Insurance Benefits, her request for is limited to the claimed disability period.

those conditions; rather, she stopped working due to complications with her pregnancy.  [Tr. 200–01].  Gurgone sought treatment for her physical conditions and reported taking two prescribed medications: lorazepam for sleep and oxycodone for pain.  [Tr. 203].  She did not report seeking treatment for mental conditions.  [Id.].

C.    **Medical History**

On October 17, 2013, Gurgone presented to Dr. Thom Tarquinio for evaluation of a left ankle injury she sustained on September 20, 2013, "when a student fell on her leg while playing kickball."  [Tr. 684–85; see also Dkt. No. 19-1 at 3].  She complained of "pain and swelling" in her ankle and was prescribed physical therapy and a boot walker.  [Id.].  Dr. Tarquinio noted that Gurgone's "lower extremities" showed normal color, temperature, and sensory exams, the skin was intact, and she had "slightly limited motion of left ankle" and "mild to moderate swelling[.]"  [Tr. 685].  Dr. Tarquinio also reviewed Gurgone's X-Rays and concluded she had "no fracture."  [Id.].  Gurgone returned to Dr. Tarquinio on November 14, 2013.  [Tr. 683].  She was undergoing physical therapy and using an "air stirrup ankle brace," and reported "aching" and "pain" in her ankle and Achilles, though she was "able to walk" with "minimal discomfort[.]"  [Id.].  Gurgone's feet had normal color, temperature, and "nearly normal peroneal strength on the left"; motor and sensory exams were normal.  [Id.].  Gurgone's skin was "intact" and appeared "normal," she had full range of motion of all joints "except for slightly limited motion of left ankle," with "mild diffuse swelling" and "mild tenderness to palpitation[.]"  [Id.].

On January 15, 2014, Dr. Tarquinio noted that Gurgone "had no significant improvement in her pain," which remained "somewhat diffuse[.]"  [Tr. 681].  However, Gurgone's "left foot and ankle" showed "normal overall color and temperature, with no signs of RSD."[4]  [Id.].

---

[4] Reflex Sympathetic Dystrophy Syndrome, known as RSD or RSDS, is also frequently called Complex Regional Pain Syndrome ("CRPS").  See SSR 03-2P, 2003 WL 22399117 (Oct. 20, 2003).

Gurgone's motor and sensory exams were normal except for slight peroneal weakness, her skin was "intact," she had full range of motion except for a slight limitation of the left ankle, with mild diffuse swelling and tenderness to palpation. [Id.]. Because Gurgone's symptoms included "diffuse" pain and tenderness, it was "difficult to make a definite diagnosis," so Dr. Tarquinio ordered an MRI and suggested that she start "some gentle exercises, such as stationary bike or elliptical machine." [Id.]. Dr. Tarquinio also noted that Gurgone was three to four months pregnant. [Id.].

Gurgone visited Dr. Tarquinio on February 26, 2014 to "review her recent MRI." [Tr. 677]. She reported that the "medial pain" had "improved," but the "anterolateral pain" remained and the ankle was occasionally "giving away." [Id.]. The MRI showed "evidence of medial and lateral ligament sprain, but no occult bone, tendon or joint injury." [Id.]. Gurgone's left ankle showed normal color and temperature with no signs of RSD, full range of motion, and "moderate tenderness[.]" [Id.]. Dr. Tarquinio said "that the next usual step in treatment would be a steroid injection," but Gurgone, six months pregnant, was "told by her OBG doctor that she cannot have an injection." [Id.]. Dr. Tarquinio recommended that Gurgone "continue with activities as tolerated and a home exercise program," and to return to the clinic in July 2014. [Id.].

Gurgone returned to Dr. Tarquinio on July 22, 2014, reporting pain surrounding her left ankle and foot, and that the ankle was occasionally "giving away." [Tr. 675]. Dr. Tarquinio noted that Gurgone's "left foot and ankle" showed normal color and temperature with "no clinical signs of RSD." [Tr. 676]. Gurgone had full range of motion with "mild crepitation over the peroneal tendons," and swelling and moderate tenderness. [Id.]. Gurgone already gave birth, but because she was breastfeeding she still could not have the steroid injection. [Id.]. Dr. Tarquinio "briefly discussed" with Gurgone that her condition "may require surgical treatment." [Id.].

On March 11, 2015, Gurgone had an initial visit with Dr. Carol A. Barrette, an orthopedic surgeon. [Tr. 639]. Dr. Barrette found that Gurgone's left ankle was swollen but had no deformity, and that Gurgone had "significant discomfort" with some movements but "less pain" or "minimal discomfort" with others. [Tr. 640–41]. The skin and coloration were "normal," though Dr. Barrette could feel "popping" when "putting [the] foot through range of motion," which would be "aggravated by walking with the foot inverted." [Id.]. Gurgone rated her pain at "4/10." [Id.]. Dr. Barrette recommended that Gurgone have an "injection before proceeding with surgery," so Gurgone decided to stop breastfeeding, and might then proceed to "an isolated surgery over the anterolateral aspect of the foot and ankle." [Id.]. On March 18, 2015, Gurgone reported that the pain "resolved" after the injection, but on March 26, 2015, Dr. Barrette "identified" that Gurgone "still had quite a bit of discomfort laterally" and "the injection had not worked." [Tr. 643–45]. Gurgone "decided she wanted to proceed with surgery." [Id.].

Dr. Barrette performed the surgery on May 29, 2015. [Tr. 670–72]. At a postoperative evaluation on June 1, 2015, Dr. Barrette noted that Gurgone was having difficulty tolerating pain medications, but otherwise did "not appear to have developed overt RSD[.]" [Tr. 649–50]. On June 4, 2015, Dr. Barrette noted that Gurgone was "healing well" and there was "no erythema." [Tr. 651]. On June 11, 2015, Dr. Barrette again noted that the "wound" was "clean and dry" and there was "no erythema," but Gurgone was still reporting "a lot of nerve pain." [Tr. 653]. On June 18, 2015, Dr. Barrette "removed the last staples" and noted that pain was "present" but "decreasing." [Tr. 655]. On June 23, 2015, Gurgone was fitted for a "cast shoe," and stated she felt comfortable and had no questions after cast care and instruction review. [Tr. 657]. On July 1, 2015, Gurgone reported to Dr. Barrette that she felt "a significant amount of burning pain." [Tr. 659]. Dr. Barrette found "no unusual swelling or erythema," and "no color changes," and

concluded that Gurgone was "starting to develop RSD." [Id.]. Dr. Barrette prescribed a nerve cream and filled out paperwork "indicating that it will take at least 3 or 4 months before [Gurgone] is able to return to work." [Tr. 660]. On July 15, 2015, Gurgone "indicate[d] that she [was] starting to get better" but had "burning pain over the lateral foot." [Tr. 662]. Gurgone was unable to use the nerve cream because "it caused some skin problems[.]" [Id.]. Dr. Barrette found that Gurgone had "[p]ain syndrome postop" and went over some "strengthening exercises". [Tr. 662–63].

On August 3, 2015, Gurgone told Dr. Barrette that she was still experiencing "a lot of burning pain in the toes," which was starting to develop in the heel. [Tr. 664]. Dr. Barrette noted that the incision healed well, though Gurgone had "significant pain with light touch." [Id.]. Dr. Barrette diagnosed Gurgone with "plantar fasciitis," "[r]eflex sympathetic dystrophy" and "[p]eroneal tendinitis," and prescribed physical therapy. [Tr. 665]. On August 31, 2015, Gurgone reported "burning pain in her heel, toes, and her incision area," and that she felt she was "getting worse." [Tr. 666]. Gurgone expressed interest in referral to a pain clinic, and Dr. Barrette noted they would try to get approval from Workmen's Compensation for that. [Tr. 666–67]. Dr. Barrette assessed that Gurgone was suffering from "[c]hronic pain syndrome." [Tr. 667]. On September 28, 2015, Gurgone reported worsening pain even though she was "going to physical therapy twice a week," and that she scheduled "her first appointment with the pain clinic" for November 2015. [Tr. 668]. Dr. Barrette noted that the "pain syndrome" was getting worse and has "probably been present . . . for several years," but was "aggravated by the surgical procedure." [Tr. 669]. She diagnosed Gurgone with "[c]omplex regional pain syndrome I of left leg" and "[p]eroneal tendinitis, left leg." [Id.].

On November 5, 2015, Gurgone met with Dr. Prashant Kumar at the St. Vincent Physician Services Pain Clinic. [Tr. 599–602]. Dr. Kumar's notes indicate that Gurgone complained of

"[b]urning outside 2 toes, numb, cold, electric shock color changes, throb ache," and "[h]eel stabbing pains, now radiating up leg to back to shoulder." [Tr. 599]. Dr. Kumar also noted that Gurgone had an "irregular gait; limp on left," with "decreased sensation" over some of her left toes and decreased temperature in her left compared to the right. [Tr. 602]. Dr. Kumar found that Gurgone had "[a]nkle pain" and "[c]omplex regional pain syndrome, type II, lower limb." [Id.].

On November 20, 2015, Gurgone presented to Dr. Mark Slovenkai at Boston Sports and Shoulder Center for evaluation of her complex regional pain syndrome ("CRPS") diagnoses. [Tr. 604]. Dr. Slovenkai found that Gurgone had "a well healed surgical incision" with "no discrete signs of erythema or infection" and there was "no evidence of significant color change of the left lower extremity," though Gurgone had "marked allodynia" and did "not tolerate much light touch in any significant fashion." [Tr. 605]. Dr. Slovenkai's "impression" was that Gurgone suffered from "Left ankle CRPS," and he advised that Gurgone "follow up with her primary care physical for further treatment and care of her CRPS." [Id.].

On January 13, 2016, Dr. Edgar L. Ross performed an independent medical examination. [Tr. 618–24]. Dr. Ross assessed that Gurgone "demonstrated close to a 1 degree celsius [sic] temperature difference between the left and right foot as well as allodynia to light touch," but no "discernable trophic changes," concluding that Gurgone's diagnosis of CRPS was "by subjective symptoms only," and she did "not have any of the objective criteria required" for a CRPS diagnosis. [Tr. 620]. Dr. Ross stated that Gurgone could "return to work, with modification of lifting limited to 20 lbs.," and that her ongoing treatment "should consist of support to return to work, with active therapy tailored to full time work." [Id.]. On January 25, 2016, Dr. Ross followed up on his examination via letter, stating that he reviewed "the surveillance tape" of Gurgone "ambulating to a medical clinic while pushing a young child in a stroller," and "able to

put the young child into her car lifting him up with one arm while also manipulating objects with her other hand." [Tr. 617]. The tape also showed Gurgone able to "play with a dog while bending over at more than 90 degrees repeatedly" and "picking up a young child from a grocery cart." [Id.]. Dr. Ross concluded that Gurgone "has significant function and minimum impairment allowing her to return back to work fulltime." [Id.].

On March 29, 2016, Gurgone visited Dr. Margaret Owegi at UMass Memorial on referral from her primary care physician, Dr. Sabitha Gopalswamy, for consultation regarding Gurgone's CRPS diagnoses. [Tr. 692]. Dr. Owegi found that though she could not "discount" that Gurgone "may have had" CRPS after her surgery, Dr. Owegi would "defer further assessment" of CRPS to a specialist because Gurgone did not have swelling, "asymmetry in temperature," "sensation to touch," or "skin discoloration or atrophy of extremities." [Tr. 694]. Dr. Owegi noted that Gurgone had "multiple other symptoms that do not appear to be related" to CRPS. [Id.].

On April 18, 2016, Gurgone went to Dr. Roberto Feliz at the Boston Pain Center in Hyde Park for an "evaluation of CRPS[.]" [Tr. 885]. Gurgone was "referred by her primary care physician . . . for a second opinion of how to best proceed with her CRPS." [Id.]. Dr. Feliz examined Gurgone for "clinical features" of CRPS, finding that her pain intensity was "severe," that "lightly touching" the skin brought "true hypersensitivity from distal leg to foot and ankle," and that Gurgone "guards and protects the entire distal leg from any touching or rubbing of the skin." [Tr. 888]. The "skin color" was pale and "temperature" was "normal to touch." [Id.]. Dr. Feliz concluded that Gurgone had "most of the classic clinical signs and symptoms" of CRPS, including "moderate to severe burning pain despite the apparent healing," "cold sensation," "hypersensitivity and allodynia," "joint and muscle stiffness of entire left foot and ankle," and "swelling and sensation as if her toes and foot is crawling inward." [Tr. 889]. "Based upon these

8

criteria," Dr. Feliz found that "Gurgone does have CRPS," and remarked that she "is permanently totally disabled . . . for the foreseeable future." [Tr. 889, 892]. On May 18, 2016, Dr. Feliz scheduled Gurgone for a lumbar sympathetic block procedure [Tr. 881, 883–84], but on June 22, 2016, Gurgone told Dr. Eduard Vaynberg at Boston Pain Center that she was feeling "extremely anxious" about that procedure. [Tr. 877–78]. On August 2, 2016, Gurgone informed Dr. Feliz that she decided to "place on hold the trial of sympathetic block" and "give the scrambler therapy a trial before the nerve block."[5] [Tr. 930]. Gurgone continued to see Dr. Feliz on a monthly basis through September 29, 2017. [Tr. 922–37; 1011–75; 1139–46]. Over this year of visits, Gurgone's symptoms and Dr. Feliz's diagnoses remained consistent. [Id.].

On December 2, 2016, Dr. Mark S. Kaplan at UMass Memorial performed an "Impartial Physician Examination." [Tr. 973–79]. Gurgone reported that she had "difficulty with basic activities of daily living," was "minimally active at home," had "difficulty with stair climbing," and was "unable to provide care for her son." [Tr. 974]. Dr. Kaplan observed that Gurgone was "unable to fully weight bear over the left lower extremity and was unable to place her foot flat on the floor," but found "no appreciable differences in lower extremity skin color or nail or hair growth." [Tr. 975]. After careful review of the medical record, including reports from Drs. Barrette, Slovenkai, Ross, and Feliz, as well as MRIs and an EMG (electrodiagnostic) Report, Dr. Kaplan concluded that Gurgone had "chronic neuropathic pain," and "[t]here were no objective clinical findings that would support a diagnosis of CRPS." [Tr. 975–77]. Dr. Kaplan nonetheless opined Gurgone "is unable to perform activities of daily living without assistance" and "has a total disability and is considered medically disabled at this time." [Tr. 978].

---

[5] It is unclear whether Gurgone underwent scrambler therapy.

On April 10, 2017, Dr. Amin Sabra performed a neurological "Independent Medical Examination" of Gurgone. [Tr. 1110–19]. Gurgone's "Left Leg and Foot" showed "[n]o change of temperature, no discoloration, no increased or decreased sweating, with normal-looking skin and nails." [Tr. 1117]. While she had "hypersensitivity to touch anywhere on the left foot," the left foot and leg were "warm and with no significant atrophy" and showed "minimal swelling as compared with the right side." [Id.]. Dr. Sabra reviewed medical records from Drs. Tarquinio, Barrette, Feliz and Slovenkai, "along with the various radiology and physical therapy notes," and found no "objective abnormalities" to support a CRPS diagnosis. [Tr. 1110, 1118]. Dr. Sabra also noted that if Gurgone did have CRPS "since 2013 or 2014 one would expect her left foot and leg to be cold and atrophied," which was not the case. [Id.]. Dr. Sabra concluded that Gurgone reached "a point of maximum medical improvement," and her "current and ongoing symptoms are the result of pre-existing condition of anxiety and cannot be caused by a left ankle sprain." [Tr. 1118–19]. Dr. Sabra found that there was no "objective basis" for Gurgone's "ongoing and total disability with regard to her injury at work dated September 20, 2013," and she "would be able to resume her regular job with regard to that injury with no restrictions." [Tr. 1119].

### D.   State Agency Opinions

#### 1.   Physical

On August 1, 2016, Dr. R. McFee conducted an initial evaluation of Gurgone's claim for DIB and found that Gurgone was not disabled. [Tr. 90–102]. Dr. McFee assessed that Gurgone suffered from two severe medically determinable impairments, "Dysfunction—Major Joints" and "Reconstructive Surgery of Weight Bearing Joint," as well as four "Non-Severe" impairments. [Tr. 96]. Dr. McFee determined that Gurgone has the Residual Functional Capacity ("RFC") to occasionally lift and/or carry up to twenty pounds, frequently lift and/or carry up to ten pounds,

stand and/or walk for a total of four hours with normal breaks, sit for a total of six hours in an eight-hour workday, and push and pull in the lower left extremity to a limited degree; Gurgone can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but she can never climb ladders, ropes or scaffolds; Gurgone has no manipulative, visual or communicative limitations, but should avoid concentrated exposure to extreme cold, wetness, fumes, odors, dusts, gases, or poor ventilation, and avoid even moderate exposure to vibration and hazards such as machinery or heights.  [Tr. 98–99].  Based on Gurgone's RFC, Dr. McFee concluded that Gurgone cannot perform her past relevant work, but there were other occupations in the national economy she could perform.  [Tr. 100–01].

On November 21, 2016, Dr. Theresa Kriston evaluated Gurgone's claim on reconsideration and found that Gurgone was not disabled.  [Tr. 104–20].  Gurgone claimed that her pain was ongoing and worsening.  [Tr. 105].  Dr. Kriston found six severe medically determinable impairments: "Disorders of Autonomic Nervous System," "Spine Disorders," "Other and Unspecified Arthropathies," "Obesity," "Affective Disorders" and "Anxiety Disorders." [Tr. 111]. There were two additional "Non Severe" conditions.  [Id.].  Because Dr. Feliz was Gurgone's current pain specialist, "his opinion [was] given great weight."  [Tr. 113].  However, Dr. Kriston found that there were "discrepancies" in the record, and Dr. Feliz's medical opinion "contrasts sharply" with other evidence in the record, which "renders it less persuasive."  [Tr. 113, 118]. Dr. Kriston also noted that determination of disability "is reserved for the commissioner."  [Tr. 113].  Dr. Kriston generally confirmed Dr. McFee's RFC, but added that Gurgone should "be able to change position every hour for 5 minutes to relieve discomfort" and avoid concentrated exposure to environmental limitations.  [Tr. 113–15].  Dr. Kriston assessed that based on

Gurgone's RFC, she cannot perform her past relevant work, but there were other jobs in the national economy she could perform.  [Tr. 118–19].

### 2.   Mental

Dr. Kriston found that two of Gurgone's severe impairments are "Affective Disorders" and "Anxiety Disorders," which require concentration and persistence limitations but no understanding or memory limitations.  [Tr. 111; 116–17].  Dr. Kriston found that Gurgone was not significantly limited in carrying out short and simple instructions, working in coordination or proximity with others, carrying out routine, and making simple work-related decisions.  [Tr. 116–17].  However, Gurgone was moderately limited in carrying out detailed instructions, maintaining attention or concentration for extended periods, punctually adhering to a regular schedule, and completing work without interruptions from psychological symptoms.  [Id.].  Dr. Kriston also assessed that Gurgone had a moderate limitation on appropriately interacting with the general public, and would "perform better in a more independent job role."  [Id.]

### E.   Hearing Testimony

The ALJ held a hearing on October 31, 2017.  [Tr. 37–65].  Gurgone was represented by counsel, who confirmed that there were no objections to the proposed exhibits and that the record was complete.  [Tr. 40].

### 1.   Claimant's Testimony

In response to questions from the ALJ, Gurgone first testified about her work history, including jobs at vocational schools in Springfield and central Massachusetts, and, before that, waitressing.  [Tr. 43–46].  Gurgone testified that the condition preventing her from working is CRPS, which is "very debilitating"—she gets about four hours of sleep a night, takes oxycodone just to lie down, and finds it "very difficult to be cheerful or even competent to stay on task."  [Tr.

46–47].  Gurgone stated that her husband takes care of chores such as cooking and laundry, as well as the majority of childcare, though she watches her son two days a week and grocery shops with assistance from her husband, mother or mother-in-law, and can drive short distances.  [Tr. 47–48].  For fun, Gurgone watches television and reads, and uses her phone to check her email.  [Tr. 49].  Since her surgery, Gurgone no longer goes to church because she cannot sit in the pews.  [Tr. 50].  Gurgone takes Lorazepam for sleep and Butalbital for migraines.  [Tr. 50–51].  In response to questions from her attorney, Gurgone testified that her pain has consistently been at least seven out of ten.  [Tr. 51].  Standing still is "excruciating," so she has to move or lie down, but when she tries to lie down she is "constantly rolling around" until the oxycodone takes effect.  [Tr. 52, 54].  Gurgone also "typically" rubs her leg because it helps her feel like she is "calming" the pain, which, counsel observed, she was doing at the hearing.  [Tr. 54–55].  Gurgone testified that her "current treating doctor" was "Dr. Feliz" and stated he was "a CRPS specialist."  [Tr. 56].

The ALJ and Gurgone's counsel then engaged in a colloquy regarding Dr. Feliz's medical opinion.  [Tr. 57–59].  The ALJ observed that "several doctors" did not diagnose Gurgone with CRPS, while only "one of them" did, the one she's seeing."  [Tr. 57].  In response, counsel stated that Dr. Kaplan, who was "impartial," also thought Gurgone has CRPS, though Dr. Kaplan "doesn't call it CRPS, he calls it neuropathic pain."  [Id.].  The ALJ took issue with this, noting that "CRPS is a particular diagnostic finding" that requires a claimant to show "more than just complaints of unusual pain, otherwise known as allodynia," and counsel agreed.  [Tr. 57–58].  Counsel nonetheless contended that Exhibit "10-F, Page 11" "through 20" supports a CRPS diagnosis.[6]  [Id.].  The ALJ stated she would consider this argument.  [Tr. 59].

---

[6] This aligns with the portion of the record including Dr. Feliz's initial evaluation of Gurgone on April 18, 2016.  [See Tr. 885–94].

### 2. Vocational Expert Testimony

Vocational Expert Elaine Pagliano ("Pagliano") testified in response to three hypotheticals posed by the ALJ.  The first hypothetical described someone with Gurgone's limitations.  [Tr. 61–62].  Pagliano testified that such an individual would not be able to perform Gurgone's past relevant work, but would be able do other work in the national or local economy, including small parts assembler (45,000 jobs nationally, 475 in Massachusetts), inspector (54,000 jobs nationally, 600 in Massachusetts) or mail sorter (48,000 jobs nationally, 555 in Massachusetts).  [Tr. 61–62]. Pagliano stated that the job numbers she provided were only half of the total number of jobs available.  [Tr. 62].  This to account for Gurgone's limitations of "walking and standing" for only two hours, "sitting eight hours" and "alternating sitting, standing once an hour," as well as only "occasional push/pull with the left side."  [Id.].  The ALJ modified the hypothetical to include additional limitations of "no teamwork or collaboration" and being able "to alternate sitting and standing up to five times an hour while continuing to work."  [Id.].  Pagliano testified that an individual with those added limitations would still be able to perform the jobs identified, but the job numbers would have to be reduced by another 25 percent.  [Tr. 63].  The ALJ modified the hypothetical once more to include a limitation that the individual would be absent from work at least twice a month due to their condition, or would be off task for two hours to lie down.  [Id.]. Pagliano testified that an individual with either of those final limitations would not be employable. [Id.].  Counsel had no questions for the vocational expert.  [Id.].

### F. Administrative Decision

The ALJ issued her decision on November 28, 2017, finding that Gurgone was not disabled during the claimed disability period under Sections 216(i) and 223(d) of the Social Security Act. [Tr. 7–31].  The ALJ relied on the "five-step sequential evaluation process for determining whether

an individual is disabled[.]"  [Tr. 11 (citing 20 C.F.R. § 404.1520(a))].  For step one, the ALJ determined that Gurgone "last met the insured status requirements" for DIB on March 31, 2017 and had not engaged in "substantial gainful activity" during the claimed disability period.  [Tr. 12].  In step two, the ALJ found that Gurgone suffered from five severe impairments during the claimed disability period: chronic pain syndrome, left thumb tendonitis, left foot fracture and torn ligament, depression, and anxiety.  [Id.].  The ALJ concluded that Gurgone did not suffer from CRPS, because "the record contains consultations and evaluations by specialists . . . [who] opined that [Gurgone] does not meet the requirements for CRPS."  [Tr. 13].  The ALJ reviewed Gurgone's medical record, citing the opinions of Drs. Sabra, Kaplan, and Ross to support her conclusion.  [Tr. 12–14].  At step three, the ALJ found that Gurgone did not show "an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments" in the Code of Federal Regulations.  [Tr. 14].

Prior to step four, the ALJ evaluated Gurgone's RFC, engaging in a detailed review of the record.  [Tr. 16–24].  The ALJ began by examining the hearing testimony, finding that Gurgone's statements regarding the "intensity, persistence and limiting effects" of her pain were "not entirely consistent with the medical evidence and other evidence in the record[.]" [Tr. 17].  At the hearing, Gurgone changed sitting to standing five times and rubbed her left leg above and below the knee, but "did not exhibit pain behaviors" during those actions.  [Id.].  The ALJ noted that "this one observation" was not dispositive, but was "consistent with the documentary medical evidence ruling out CRPS and finding that [Gurgone] has a greater exertional capacity," as evidenced by activities captured on video and considered by Dr. Ross.  [Id.].  The ALJ reviewed medical records from Drs. Tarquinio, Barrette, Kumar, Slovenkai, Feliz, Vaynberg, Ross, Kaplan and Sabra [Tr. 17–22], rejecting Dr. Feliz's opinion because he "has no findings" other than Gurgone's "excessive

pain complaints (allodynia)," except for one occasion when he "noted a finding of cold extremity." [Tr. 22]. The ALJ also rejected Gurgone's counsel's argument from the hearing, noting that "the only findings" by Dr. Feliz "consistent with CRPS" are Gurgone's subjective "complaints of pain/hypersensitivity[.]" [Id.]. "Considering all the significant conflicting medical, clinical and activities of daily living information," the ALJ concluded, "the undersigned cannot in good conscience find the claimant meets the requirements for disability." [Id.]. Rather, "considering the totality of the evidence," Gurgone has an RFC permitting "light work as defined in 20 C.F.R. § 404.1567(b)," with various additional limitations. [Id.]. Based on this RFC, the ALJ found at step four that Gurgone cannot perform her past relevant work, but concluded at step five—based on the testimony of the vocational expert—that Gurgone "was capable of making a successful adjustment to other work that existed in significant numbers in the national economy." [Tr. 25].

## II.    STANDARD OF REVIEW

The District Court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). However, the Court may not disturb the Commissioner's findings where they are supported by substantial evidence and the Commissioner has applied the correct legal standard. Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [her] conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). Although the administrative record might support multiple conclusions, the Court must uphold the Commissioner's findings when they are supported by substantial evidence. Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991). The quantum of proof necessary to sustain the Commissioner's decision is less than a preponderance of the evidence.

Bath Iron Works Corp. v. U.S. Dep't of Labor, 336 F.3d 51, 57 (1st Cir. 2003).   Therefore, a finding that a claimant's allegations are supported by substantial evidence does not mean that the Commissioner's decision is unsupported by substantial evidence.

It is the plaintiff's burden to prove that she is disabled within the meaning of the Social Security Act.   Bowen v. Yuckert, 482 U.S. 137, 145–46 (1987).   The plaintiff bears the burden of production and persuasion at steps one through four of the sequential evaluation process.   Id. at 146 n.5; Vazquez v. Sec'y of Health & Human Servs., 683 F.2d 1, 2 (1st Cir. 1982).   This includes the burden of establishing her RFC.   West v. Berryhill, No. 17-1170, 2017 WL 6499834, at *1 (1st Cir. Dec. 11, 2017) (citing Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 7 (1st Cir. 1982)).   At step five, the Commissioner has the burden of identifying specific jobs in the national economy that the plaintiff can perform.   Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

## III.   ANALYSIS

Gurgone makes five arguments to support her claim that the ALJ's decision should be reversed or remanded.   [Dkt. No. 19-1 at 1–2].   I find the arguments unpersuasive.

### A.   The ALJ Assigned Proper Weight to the Treating Physician's Findings

Gurgone contends that her treating physician, Dr. Feliz, diagnosed her with CRPS and determined she was permanently disabled.   [Id. at 5].   According to Gurgone, the ALJ "ignored and discounted" this finding "without any rationale or justification, other than the assertion that Dr. Feliz did not note each and every criteria for CRPS[.]"   [Id. at 6].   Gurgone argues that this is contrary to law, because the treating physician's opinion "must be accorded controlling weight" if it is "well supported by medically-accepted [sic] clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence of record."   [Id. at 5 (citing Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998))].

This argument fails.  The ALJ found that Dr. Feliz's opinion is inconsistent with other substantial evidence in the record.  [Tr. 22].  Reviewing the record, the Court cannot find that this determination is unsupported by substantial evidence.  Cf. Patoski v. Berryhill, 320 F. Supp. 3d 283, 291 (D. Mass. 2018) (citations omitted) ("To determine whether an individual is disabled, the ALJ must weigh several potentially conflicting medical opinions," and "may consider whether they are consistent with the record as a whole.").  As to Dr. Feliz's statement that Gurgone has a permanent disability, this carries no weight under 20 C.F.R. § 404.1527(d)(1),[7] which clearly states that the Commissioner is "responsible for making the determination or decision about whether" a claimant meets "the statutory definition of disability."  Indeed, the regulation is explicit that a "statement by a medical source" that a claimant is "'disabled' or 'unable to work' does not mean that" the ALJ "will determine that" the claimant is "disabled."  Id.

Gurgone also contends that when the ALJ discounted Dr. Feliz's CRPS diagnosis, this was contrary to Social Security Ruling 03-2p ("SSR 03-2p"), which states that "conflicting evidence in the medical record is not unusual in cases of [CRPS] due to the transitory nature of its objective findings and the complicated diagnostic process involved."  [Dkt. No. 19-1 at 6 (quoting SSR 03-2P, 2003 WL 22399117, at *5 (Oct. 20, 2003))].  However, SSR 03-2p is clear that CRPS "requires the presence of chronic pain and one or more clinically documented signs in the affected region," including "swelling, autonomic instability," "abnormal hair or nail growth," "osteoporosis" or "involuntary movements of the affected region[.]"  SSR 03-2P, 2003 WL 22399117, at *4, 6.  While the ALJ did not cite SSR 03-2p, she addressed its standards, finding that Dr. Feliz noted "on only one occasion a finding of cold extremity," and otherwise relied on Gurgone's "excessive pain complaints" to diagnose CRPS.  [Tr. 22].  This conclusion is supported

---

[7] 20 C.F.R. § 404.1527 is utilized for "[e]valuating opinion evidence for claims filed before March 27, 2017."

by the record, which shows that over the course of more than a year, between April 18, 2016 to September 29, 2017, Dr. Feliz relied on Gurgone's reports of subjective pain, not the objective criteria for a finding of CRPS.  [Tr. 921–37; 1011–77; 1139–46].

Further, the record reflects that a number of other doctors, including impartial and independent medical examiners, determined that Gurgone did not suffer from CRPS precisely because the expected or objective clinical findings which would support CRPS were not present. [Tr. 973–79; 1110–19].  Indeed, as the ALJ noted, only one doctor, Dr. Feliz, consistently and repeatedly found a diagnosis of CRPS.  The Court's review is limited to clear error or lack of substantial evidence, neither of which is present here.

### B.    The ALJ Gave Proper and Consistent Weight to Dr. Kaplan's Opinion

Gurgone contends that the ALJ "cherry picks the findings of Dr. Kaplan," giving great weight to Dr. Kaplan's conclusion that Gurgone "had chronic neuropathic pain but did not meet the medical objective and subjective requirement for diagnosis of" CRPS, while "ignoring" his "findings" that Gurgone's pain is "totally disabling her from work."  [Dkt. No. 19-1 at 7].  This argument fails as a matter of law, because "determination of disability is reserved to the Commissioner, not to any particular treating source."  Reeves v. Barnhart, 263 F. Supp. 2d 154, 162 (D. Mass. 2003) (citations omitted); see also 20 C.F.R. § 404.1527(d)(1).

Gurgone also argues that the ALJ twisted Dr. Kaplan's and Dr. Sabra's opinions to "shoehorn" them into supporting the conclusion that Gurgone did not satisfy SSR 03-2p's requirement of objective clinical findings to diagnose CRPS.  [Dkt. No. 19-1 at 7].  This is inaccurate.  Dr. Kaplan explicitly noted that even though Gurgone presented subjective pain symptoms sufficient to meet a diagnosis of neuropathic pain syndrome, "[t]here were no objective clinical findings that would support a diagnosis of CRPS."  [Tr. 977].  Dr. Sabra likewise stated

that there was no objective evidence of CRPS, and found that Gurgone's subjective pain was "the result of a pre-existing condition of anxiety[.]"  [Tr. 1118–19].  These conclusions track the logic and standards of SSR 03-2p, rejecting CRPS because Gurgone did not present objective symptoms.

Lastly, in conclusory fashion, Gurgone claims that "the non-treating medical opinions cited by the ALJ may have be [sic] subject to bias."  [Dkt. No. 19-1 at 9].  Gurgone makes a similar argument later in her motion, stating that "the impartiality of the independent examiner's [sic] should be questioned in light of the purpose they we [sic] retained, namely workers' compensation litigation."  [Id. at 10].  The Court finds nothing in the record suggesting bias, and Gurgone did not raise this issue during her hearing before the ALJ or on administrative appeal.  Indeed, Gurgone offers nothing to support this conclusory allegation and fails to develop it.  The Court will not entertain a claim made only in a "perfunctory manner."  Oliveras v. Comm'r of Soc. Sec., 354 F. Supp. 3d 84, 94–95 (D. Mass. 2019); see also Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1998) ("a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (quotation omitted)).

### C.     The ALJ Properly Evaluated Gurgone's Credibility

Gurgone asserts three reasons why the ALJ was wrong to find her "not entirely credible." [Dkt. No. 19-1 at 9–11].  First, Gurgone contends that the ALJ improperly referred "to a few isolated symptom-free instances," including Gurgone's "behavior during a one hour hearing," to show that her "activities of daily living do not support her allegations of disability."  [Id. at 10]. This is a mischaracterization of the ALJ's decision.  The ALJ extensively reviewed medical opinions from Drs. Tarquinio, Barrette, Kumar, Feliz, Vaynberg, Ross, Sabra and Kaplan, noting the many instances in which various doctors noted the absence of objective CRPS symptoms.  [Tr. 17–22].  The ALJ also mentioned the video footage that Dr. Ross reviewed, which captured

Gurgone ambulating, pushing and folding a stroller, and manipulating objects, leading Dr. Ross to conclude that Gurgone has "significant function and minimal impairment[.]"  [Tr. 20].  As to Gurgone's claim that the ALJ improperly relied on her behavior during the hearing, the ALJ explicitly stated that this "one observation" was not the basis of the ALJ's decision.  [Tr. 17]. Rather, the ALJ noted this behavior because it was "consistent with the documentary medical evidence ruling out CRPS[.]"  [Id.].  This finding is supported by substantial evidence.  Dr. Feliz, the physician on whose opinion Gurgone relies, stated that Gurgone "guards and protect[s] the entire distal leg from any touching or rubbing of the skin," in contrast with Gurgone's conduct during the hearing, when she was actively rubbing and massaging her leg and testified this helps alleviate her pain.  [Tr. 22, 888].  This contradiction, as the ALJ points out, casts some doubt on Gurgone's credibility.  Cf. Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) (citation omitted) ("The credibility determination by the ALJ, who observed the claimant, evaluated [her] demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings.").

Second, Gurgone contends that the ALJ "must articulate specific reasons for finding a claimant is an unbelievable witness and there must be substantial evidence to support such a finding." [Dkt. No. 19-1 at 10 (citing Rohrberg, 26 F. Supp. 2d at 309)].  In Rohrberg, the District Court rejected the ALJ's credibility determination because "[t]he ALJ made no reference to [claimant's] demeanor, evasiveness or combativeness, nor to any other observations indicating a basis for discrediting her testimony, such as contrary medical evidence or observation of activities which might reflect negatively on her credibility."  26 F. Supp. 2d at 310.  Here, the ALJ took note of Gurgone's behavior, cited extensively to the medical record, and to Dr. Ross' conclusions from video evidence, all of which tended to discredit Gurgone's testimony.

Third, Gurgone contends that the ALJ failed to consider "all the factors required" in making a pain credibility determination, as delineated in <u>Avery v. Secretary of Health and Human Services</u>. [Dkt. No. 19-1 at 9, 11 (citing 797 F.2d 19 (1st Cir. 1986))]. In <u>Avery</u>, the First Circuit articulated various factors that "must be considered in assessing the impact of the claimant's subjective allegations of pain on his residual functional capacity[.]" <u>Guyton v. Apfel</u>, 20 F. Supp. 2d 156, 166 n.10 (D. Mass. 1998) (citing <u>Avery</u>, 797 F.2d at 29 (Appendix)). "While the ALJ must <u>consider</u> each of these factors, there is no requirement that she make specific findings regarding each of the factors in her written decision." <u>Escobar v. Colvin</u>, No. 13-10186-JGD, 2014 WL 1159822, at *16 (D. Mass. Mar. 20, 2014) (emphasis in original) (citing 20 C.F.R. § 404.1529(c)(3). The ALJ's decision indicates that she met this burden. Under <u>Avery</u>, it is "essential" for the ALJ to:

> [I]nvestigate all avenues presented that relate to subjective complaints, including the claimant's prior work record and information and observations by treating and examining physicians and third parties, regarding such matters as: 1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain; 2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions); 3. Type, dosage, effectiveness, and adverse side-effects of any pain medication; 4. Treatment, other than medication, for relief of pain; 5. Functional restrictions; and 6. The claimant's daily activities.

797 F.2d at 29 (Appendix); <u>see also</u> <u>Guyton</u>, 20 F. Supp. 2d at 166 n.10. Here, the ALJ heard Gurgone's testimony about these matters through her own or counsel's questioning. Gurgone testified about her work history and spoke at length about her CRPS—its onset, duration and intensity, aggravating factors, treatment and medications, functional restrictions and impact on activities of daily living and daily routine. [Tr. 43–56]. This testimony added information to an already voluminous record, which includes disability reports [Tr. Exs. 1E and 2E], a pain questionnaire [Tr. Ex. 3E], report on activities of daily living [Tr. Ex. 4E], work history reports [Tr. Exs. 6E and 7E], and a medications report [Tr. Ex. 16E]. The nearly 800 pages of medical

history depict the nature and onset of Gurgone's pain, aggravating factors, medications and side effects, other treatments such as physical therapy, and Gurgone's daily routines and restrictions. [Tr. Exs. 1F–24F].  The ALJ's detailed decision reflects careful consideration of Gurgone's testimony and the extensive record, demonstrating that she considered the <u>Avery</u> factors.  The Court finds no error.

### D.      The ALJ Properly Determined Gurgone's RFC

Gurgone summarily contends that "the ALJ's assessment" of the RCF "appears as a conclusion," without "reasoning and no citation of specific facts."  [Dkt. No. 19-1 at 11–12]. Gurgone overlooks the eight single-spaced pages of analysis and discussion in the ALJ's decision supporting the RFC determination.  [Tr. 16–24].  "An ALJ uses all relevant evidence appearing in the record to determine the RFC," and "she is not 'required to recite every piece of evidence which favored appellant.'"  <u>Pina v. Astrue</u>, No. 06-10503-PBS, 2007 WL 2071791, at *6 (D. Mass. July 18, 2007) (quoting <u>Santiago v. Sec'y of Health & Human Servs.</u>, 46 F.3d 1114 (1st Cir.1995)). The ALJ need not tie each aspect of the RFC to a specific piece of evidence.  Rather, the ALJ properly considered "the totality of the evidence" to craft Gurgone's RFC, and this Court cannot overturn that determination if, as here, the "evidence in the record as a whole" is adequate to support it.  <u>Rodriguez</u>, 647 F.2d at 222.

Gurgone also contends that the RFC is "not supported by substantial evidence" because it is contrary to Dr. Feliz's and Dr. Kaplan's opinions.  [Dkt. No. 19-1 at 12].  As discussed, the ALJ's decision to reject Dr. Feliz's opinion is supported by substantial evidence.  Further, Dr. Feliz's and Dr. Kaplan's opinions that Gurgone is disabled are afforded no weight as a matter of law.  As to Dr. Kaplan's opinion that Gurgone suffers from "chronic neuropathic pain," the ALJ imposed limitations beyond light work, such as walking or standing for only two hours in an

eight-hour workday, the ability to alter sitting and standing up to five times per hour while continuing to work, never climbing ladders, ropes or scaffolds due to decreased agility, and no tolerance for hazards. [Tr. 22]. These additional limitations demonstrate that the ALJ carefully considered Gurgone's impairments, rejecting disability for CRPS while accounting for chronic pain and other severe conditions.

Lastly, Gurgone bears the burden of production and persuasion at step four of the sequential evaluation, which includes establishing her RFC. Yuckert, 482 U.S. at 146 and n.5; West, 2017 WL 6499834, at *1. "To the extent the Plaintiff desires additional RFC limitations, she has failed to establish them." Fontes v. Saul, No. 19-10772-PBS, 2019 WL 6686801, at *9 (D. Mass. Dec. 6, 2019) (citing West, 2017 WL 6499834, at *1). As the Commissioner notes in her motion, Gurgone generally argues that the RFC is deficient and devoid of reasoning but fails to substantively suggest what limitations the ALJ failed to account for, or how the RFC should be amended to more accurately reflect her impairments. The Court finds no error in the ALJ's RFC, which is supported by substantial evidence.

### E.     The ALJ Met Her Burden of Proof at Stage Five of the Analysis

At step five of the sequential evaluation, the ALJ must "determine whether the claimant is able to do any other work considering her residual functional capacity, age, education, and work experience." [Tr. 12 (citing 20 C.F.R. § 404.1520(g))]. As part of this analysis, the Social Security Administration must provide "evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do" given her limitations. [Id. (citing 20 C.F.R. §§ 404.1512(f) and 404.1560(c))]. The "opinion of a vocational expert that a Social Security claimant can perform certain jobs qualifies as substantial evidence at the fifth step of the

analysis" as long as the ALJ poses a "hypothetical that accurately describes the claimant's limitations." Sousa v. Astrue, 783 F. Supp. 2d 226, 235 (D. Mass. 2011) (citations omitted).

Gurgone takes no issue with the hypotheticals the ALJ posed to the vocational expert during the hearing, and the Court finds that they accurately reflect Gurgone's limitations. Therefore, the ALJ was entitled to rely on the vocational expert's testimony as substantial evidence when determining whether there is a significant number of jobs Gurgone can perform. At the hearing, the vocational expert testified that someone with Gurgone's limitations could perform the jobs of small parts assembler (45,000 jobs nationally, 475 in Massachusetts), inspector (54,000 jobs nationally, 600 in Massachusetts) or mail sorter (48,000 jobs nationally, 555 in Massachusetts). [Tr. 62; see also Tr. 25 (ALJ relying on the vocational expert's numbers)]. However, because of Gurgone's added limitation of no teamwork, the vocational expert recommended reducing the number of jobs for each position by an additional 25 percent, which the ALJ accounted for. [Tr. 63, 25]. The reduced number of available jobs is as follows: small parts assembler at 33,750 nationally, 356 in Massachusetts; inspector at 40,500 nationally, 450 in Massachusetts; and mail sorter at 36,000 nationally, 416 in Massachusetts. In total, based on the vocational expert's testimony, there are 110,250 jobs in the national economy and 1,222 jobs in Massachusetts that Gurgone can perform.

Gurgone contends that this is error because the vocational expert "testified to a total of 55,125 jobs in the national economy." [Dkt. No. 19-1 at 13 (citing Tr. 25)]. But the number "55,125" does not appear anywhere in the hearing transcript. Gurgone then claims that the ALJ "failed to provide any analysis or evaluation or justify her finding that 110,125 was a significant number of jobs[.]" [Id.]. To support this contention, Gurgone cites to a decision from the Tenth Circuit Court of Appeals, Trimiar v. Sullivan. [Id. (citing 966 F.2d 1326, 1330–32 (10th Cir.

1992))].   But, as the Commissioner points out in her motion, Gurgone's claim is actually undermined by Trimiar.  [See Dkt. No. 25 at 22–23].  In Trimiar, the Tenth Circuit noted that "several factors go into the proper evaluation of significant numbers," but the "decision should ultimately be left to the ALJ's common sense in weighing the statutory language as applied to a particular claimant's factual situation."  966 F.2d at 1330 (edits and quotations omitted).  Further, in Trimiar the "expert testified that 650 to 900 [relevant] jobs exist in the state of Oklahoma," and the Tenth Circuit found that this was sufficient to support the ALJ's determination of a significant number of available jobs.  Id.  The vocational expert in Gurgone's case testified that there are 1,222 relevant jobs in Massachusetts, notably more than what the Tenth Circuit accepted in Trimiar.  See also Ortiz v. Comm'r of Soc. Sec., 81 F. Supp. 3d 118, 128 (D. Mass. 2015) (finding that "there is substantial evidence in the record to support the ALJ's finding that there are a significant number of jobs" where the vocational expert testified that there were 1,110 relevant jobs available to claimant in Massachusetts).

The ALJ was entitled to rely on the vocational expert's testimony at step five of the analysis.  Her determination that there is a significant number of jobs Gurgone can perform, even accounting for her limitations, is supported by substantial evidence, and the Court finds no error.

**IV.      CONCLUSION**

For the foregoing reasons, I hereby RECOMMEND that Gurgone's Motion to Reverse or Remand the Decision of the Commissioner [Dkt. No. 19] be DENIED and Defendant's Motion to Affirm the Commissioner's Decision [Dkt. No. 24] be GRANTED.[8]

*/s/ David H. Hennessy*
David H. Hennessy
United States Magistrate Judge

---

[8] The Parties are advised that pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2), they are entitled to object to the Court's Report and Recommendation by filing a specific written objection with the Clerk of this Court within fourteen (14) days of service of this Report and Recommendation.  Such written objections must specifically identify the portion of the Report and Recommendation to which objection is made and the basis for those objections.  The Parties are further advised that the First Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) shall preclude further appellate review.  See, e.g., M. v. Falmouth Sch. Dep't, 847 F.3d 19, 26 (1st Cir. 2017); Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988).